# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:21-cv-22152-MGC

**SECURITIES AND EXCHANGE COMMISSION,**

        Plaintiff,

v.                                              **JURY TRIAL DEMANDED**

**RAMIRO JOSE SUGRANES**
**UCB FINANCIAL ADVISERS, INC. and**            **UNDER SEAL**
**UCB FINANCIAL SERVICES LIMITED,**

        Defendants, and



**RAMIRO SUGRANES HERNANDEZ and**
**THELMA LANZAS DE SUGRANES,**

        Relief Defendants.

_____/

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") hereby files its Complaint against Defendants Ramiro Jose Sugranes ("Sugranes"), UCB Financial Advisers, Inc. ("UCB Advisers"), and UCB Financial Services, Limited ("UCB Services") (collectively, the "Defendants") and Relief Defendants Ramiro Sugranes Hernandez and Thelma Lanzas De Sugranes (collectively, the "Relief Defendants"), and alleges as follows:

### SUMMARY OF ALLEGATIONS

1.      Defendant Sugranes, through UCB Advisers and UCB Services (collectively, the "UCB Entities"), engaged in a long-running fraudulent trade allocation scheme – commonly referred to as "cherry picking." Defendants' allocated thousands of profitable trades worth more than $4 million in stocks and options on securities ("Options") to two preferred accounts held at the UCB Entities in the name of the Relief Defendants Ramiro Sugranes Hernandez and Thelma

Lanzas De Sugranes, who are Sugranes' parents or relatives (collectively, "Preferred Accounts"). Sugranes also allocated millions of dollars of unprofitable trades to other investment advisory client accounts with the UCB Entities. This scheme is ongoing. The SEC brings this enforcement action to stop this fraud and return the ill-gotten gains to the harmed investors.

2.      Sugranes perpetrated this fraud through UCB Services and UCB Advisers, an investment advisory firm of which he is a partial owner. He carries out the cherry-picking scheme by first using an average price trading account used by the UCB Entities to purchase stocks and Options on behalf of numerous client accounts. Sugranes then allocates those trades to specific accounts, typically later that same day. If the position increases in value during that day, the position is usually closed out, thereby locking in the same-day profit, and the opening and closing trades and the corresponding profits are allocated to one of the Preferred Accounts. If the value of the trades decrease during that day, the position (which is worth less at the time of allocation than it was at the time of purchase and thereby has a first day loss) is usually allocated to [the account(s) of] one or more of the UCB Entities' other clients (the "Non-Preferred Accounts").

3.      This cherry-picking scheme funneled approximately $4.6 million in illicit profits to the Preferred Accounts, and negatively impacted at least 75 Non-Preferred Accounts that suffered first day losses. In total, the Non-Preferred Accounts were allocated more than $5.5 million of first day losses with 16 of the Non-Preferred Accounts sustaining more than $25,000 in first day losses, and two other Non-Preferred Accounts sustaining more than $1 million in first day losses.

4.      From this fraud, the Defendants received ill-gotten gains and benefits and the Relief Defendants received illicit proceeds from the Defendants' fraud to which they have no legitimate claim.

## SUMMARY OF VIOLATIONS

5.      By engaging in the fraudulent conduct described herein, Defendants violated and, unless they are restrained and enjoined, will continue to violate Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Exchange Act Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

6.      The SEC seeks, among other things, permanent injunctions and a conduct-based injunction against Sugranes; disgorgement of Sugranes' and the Relief Defendants' ill-gotten gains from the unlawful activity set forth in this Complaint, on a joint and several basis, together with prejudgment interest; disgorgement of UCB Advisers' and UCB Services' ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest; and third-tier civil penalties against each of the Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. In addition, the SEC seeks emergency relief to, among other things, freeze the assets of Sugranes and Relief Defendants to preserve their assets to pay their equitable liabilities, an accounting, an order preventing the destruction of documents, and an order for expedited discovery, and alternative means of service.

3

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa, and Sections 209(d) and 214(a) of the Advisers Act, 15 U.S.C. §§ 80b-9(d) and 80b-14(a).

8.      The Court has personal jurisdiction over Defendants and Relief Defendants, and venue is proper in this judicial district, because many of the acts and transactions constituting violations of the Securities Act, Exchange Act, and Advisers Act occurred in this District.  In addition, UCB Advisers has its principal places of business and Sugranes resides in this District. Also, for a period of time, the monthly account statements for one of the Preferred Accounts were sent to Sugranes' residence, which is located in this District.

9.      In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means and instruments of transportation or communication in interstate commerce, or the mails, or any facility of any national securities exchange, including placing trades using the facilities of any national securities exchange to carry-out the cherry picking scheme and wire transfers were used to withdraw money from the Preferred Accounts.

## DEFENDANTS

10.     **Ramiro Jose Sugranes** ("Sugranes"), age 57, was born in Leon, Nicaragua and is a resident of Miami, Florida.  Sugranes has been in the investment industry for more than 20 years, he is currently licensed as an investment adviser, and since 2006, he has been an investment adviser representative ("IAR") with UCB Advisers.  Sugranes has a disciplinary

history and as described below, he was permitted to resign from a prior job for failing to follow company procedures concerning transactions in one of his relative's accounts.

11.     **UCB Financial Advisers, Inc.** ("UCB Advisers") is a Florida state-registered investment adviser headquartered in Miami, Florida. UCB Advisers only has two employees, Sugranes and another individual. Sugranes is a director and owns a portion of UCB Advisers. UCB Advisers is part of the Financial Division of the Holding Company, as defined below.

12.     **UCB Financial Services Limited** ("UCB Services") conducts business in Florida, including the business and conduct at issue in this Complaint. UCB Services acts as an investment adviser, uses an address in Chile, and is affiliated with the Holding Company, of which Sugranes is an Executive Director.

## RELIEF DEFENDANTS

13.     **Ramiro Sugranes Hernandez**, age 83, is a resident of Leon, Nicaragua and is listed as a co-owner of the two Preferred Accounts, with his wife, Thelma Lanzas de Sugranes, into which profitable trades have been allocated. Upon information and belief, he is Sugranes' father or close relative.

14.     **Thelma Lanzas de Sugranes**, age 79, is the spouse of Ramiro Sugranes Hernandez, she is a resident of Leon, Nicaragua, and is listed as a co-owner of the two Preferred Accounts into which profitable trades have been allocated. Upon information and belief, she is either Sugranes' mother or close relative.

## RELATED ENTITIES

15.     **The Holding Company** according to its website, is "a conglomerate of Companies" in various fields, including financial services. Companies affiliated with the Holding Company, include UCB Services and UCB Advisers. The Holding Company uses an address in Miami, Florida.

16.     **The Broker-Dealer** is an SEC-registered broker-dealer headquartered in Miami, Florida. Broker-Dealer is the introducing broker for the UCB Entities' clients' accounts at issue in this Complaint. An introducing broker deals directly with the public and originates trading in customer brokerage accounts. Between 2001 and 2004, Sugranes was a registered representative with the Broker-Dealer's predecessor. He was permitted to resign from that job after he failed to follow company procedures concerning the documentation of certain transactions in one of his relative's accounts.

17.     **The Clearing Firm** is an SEC-registered broker-dealer headquartered in New Jersey. Clearing Firm is the clearing broker for the Broker Dealer. A clearing broker handles functions related to the clearance and settlement of trades in the accounts of the customers of an introducing broker.

## FACTS

**I.     The Defendants' Cherry Picking Scheme was a Deceptive Device that Operated as a Fraud.**

   **A.     The UCB Entities' Clients and the UCB Average Price Account**

18.     From at least September 2015 to the present ("the Relevant Period"), the UCB Entities placed trades for approximately 100 clients. Those clients are entities and individuals with addresses in the United States, including Florida, Minnesota, New York, and Texas, and other countries, including Chile, Columbia, and Nicaragua.

19.     Approximately 40 of the UCB Entities' clients – including the Relief Defendants – had accounts with both of the UCB Entities.

20.     To place trades on behalf of their clients, both UCB Entities used a single shared account named "[Broker-Dealer] – Avg Price Account – NEO-UCB" (the "UCB Average Price Account"). If used properly in this case, an average price account enables an investment adviser

to give all clients who are participating in a particular trade the same average price.  For example, if an investment adviser places a large order, this order may be executed at several different prices.  An average price account allows the investment adviser to aggregate the executions into a single average-price, ensuring the same execution price for all clients receiving a portion of the order.

### B.  The Preferred Accounts

21.     Relief Defendants Ramiro Sugranes Hernandez, age 83, and Thelma Lanzas de Sugranes, age 79, a married couple who live in Leon, Nicaragua, are identified as the owners of the two Preferred Accounts.

22.     The Preferred Accounts consist of two separate accounts, one that was held at UCB Services and a subsequent account held at UCB Advisers. From 2015 through the end of 2020, the Relief Defendants had a brokerage account at UCB Services ("First Preferred Account held at UCB Services"). In approximately December 2020, the Relief Defendants opened a different brokerage account at UCB Advisers ("Second Preferred Account held at UCB Advisers").

23.     After the Second Preferred Account held at UCB Advisers was opened, the First Preferred Account held at UCB Services was closed and the assets in this account were transferred to the Second Preferred Account held at UCB Advisers.

24.     In 2015 and early 2016, the Clearing Firm sent the monthly account statements for the First Preferred Account held at UCB Services to Sugranes' apartment in Miami, Florida.

25.     From approximately March 2016 through approximately December 2020, the Clearing Firm sent the monthly account statements for the First Preferred Account held at UCB Services to UCB Advisers' address in Miami, Florida.  A September 2018 letter to the Broker-Dealer and Clearing Firm, and purporting to be from the Relief Defendants, explained that the

Relief Defendants' physical address was in Leon, Nicaragua, but that all correspondence should be sent to UCB Advisers' Miami, Florida address "due to security concerns[.]"

26.     From approximately December 2020 through the present, the Clearing Firm sent the account statements for the Second Preferred Account held at UCB Advisers to UCB Advisers' address in Miami, Florida.

### C.     The Cherry-Picking Scheme

27.     Since at least September 2015, the Defendants have fraudulently allocated thousands of trades in dozens of securities to the Preferred and Non-Preferred Accounts to carry out their deceptive cherry-picking scheme.

28.     The cherry-picking trades are in securities as defined by the federal securities laws because they are trades in a stock or a put option or call option on a security.

29.     Options are contracts to buy or sell a security at a future point in time. Call Options give the owner the right but not the obligation to purchase a specified security at a pre-specified price, called the "strike price." Put Options are similar to call Options, except they give the owner the right but not the obligation to sell the specified security at a pre-specified strike price. Both call options and put options specify an expiration date, which is the last date that the owner has the right to exercise the option.

30.     To carry out the cherry-picking scheme, the Defendants generally open a stock or Option position in the UCB Average Price Account. If the position increases in value during that day, the position is usually sold or closed out, thereby locking in the first day profit, and the corresponding opening and closing trades and profits are allocated to the Preferred Account. If the position decreases in value during that day, the position (which is worth less at the time of allocation than it was at the time of purchase and thereby has a first day loss) is usually allocated to one or more of the Non-Preferred Accounts and held for some period of time.

1. **Purchase and Sale of Stocks**

31.    Since at least September 2015, the Defendants have allocated approximately

3,000 stock trades (with thousands of these allocations being fraudulently made) as part of their

cherry-picking scheme. The Preferred Accounts received a disproportionate amount of the

profitable stock trades. Conversely, the Non-Preferred Accounts received a disproportionate

amount of unprofitable stock trades.

32.    Specifically, between September 2, 2015, and March 26, 2021, the Defendants'

cherry-picking scheme resulted in the Preferred Account being allocated more than 1,600 stock

trades, 95% of which were profitable, generating first-day profits of $3,936,122. During the same

period, the Non-Preferred Accounts were allocated more than 1,400 stock trades, but, in stark

contrast, only 32% generated first-day profits (based on the transaction price and the closing

share price the day the trades were made). These approximately 1,400 stock trades generated

first-day losses of $4,656,007 in the Non-Preferred Accounts.

33.    Below is a table that shows how stocks allocated to the Preferred Accounts and

the Non-Preferred Accounts performed during this time:

| Accounts | Allocations | "Win" Rate | First Day Return Rate | First Day Profit/ Loss |
|---|---|---|---|---|
| Preferred Accounts | 1,605 | 95% | 0.57% | $3,936,112 |
| Non-Preferred Accounts | 1,401 | 32% | -0.75% | ($4,656,007) |

34.    An example of the cherry-picking scheme involving stock trades occurred on June

4, 2020. On that date, the UCB Average Price Account purchased 2,000 shares of Lumentum

Holdings stock for $77.70 per share. Less than 30 minutes later, the UCB Average Price Account

sold those 2,000 shares for $78.52 per share – a profit of $1,640.  Shortly thereafter, the UCB

Average Price Account purchased an additional 3,000 shares of Lumentum Holdings' stock in

1,000 increments for $77.54, $77.39, and $77.07 (for an average price of $77.33).  At the end of

the trading day, Lumentum Holdings' stock ultimately closed at $76.50 per share, meaning that the later transactions resulted in first day losses of $2,490.

35.     The profitable trades (the purchase and sale of the 2,000 shares that resulted in a locked in, first day profit) were allocated to the Preferred Account at a purchase price of $77.70 and a sale price of $78.52 for a profit of approximately $1,640, and the subsequent trades (the later purchase of 3,000 shares before the stock price decrease thereby resulting in first day losses) were allocated to four Non-Preferred Accounts at an average price of $77.33 and a price of $77.33 at market close, for a first day loss of approximately $2,490.

**2.   Purchase and Sale of Options**

36.     Since at least September 2015, the Defendants have allocated approximately 1,500 trades in Options (with at least a thousand of these allocations being fraudulently made) as part of their cherry-picking scheme. The Preferred Accounts received a disproportionate amount of the profitable Options. Conversely, the Non-Preferred Accounts received a disproportionate amount of unprofitable Options.

37.     Specifically, between September 2, 2015 and March 26, 2021, the Defendants' cherry-picking scheme resulted in the Preferred Account being allocated more than 400 Options that were profitable 92% of the time, which generated first-day profits of approximately $694,000. On the other hand, the cherry-picking scheme resulted in the Non-Preferred Accounts being allocated more than 1,100 Options that generated first-day profits only 43% of the time (based on the transaction price and the closing Options price on the day the Options were

purchased or the closing Option value when the Options position is opened on the option

expiration date), which generated first-day losses of approximately $920,000.

| Accounts | Allocations | "Win" Rate | First Day Return Rate | First Day Profit/Loss |
|---|---|---|---|---|
| Preferred Accounts | 401 | 92% | 28.85% | $693,702 |
| Non-Preferred Accounts | 1,165 | 43% | -1.91% | -$919,123 |

38.     An example of the cherry-picking scheme involving Options occurred on April

26, 2019 Amazon Options.  That day, the Defendants sold three call options with three different

strike prices in the UCB Average Price Account. One of these three trades ended up being

profitable and resulted in a first day profits of $1,250, which were allocated to the Preferred

Accounts. The remaining two call options were unprofitable, resulted in first day losses of

$2,900, and these losses were allocated to Non-Preferred Accounts.

39.     The massive disparity in the trading success of the Preferred Accounts versus the

Non-Preferred Accounts was not the result of trading the securities of different issuers.  For

example, between September 2, 2015 and March 26, 2021, 496 trades in Google's stock or

Options were allocated from the UCB Average Price Account. Of those trades, 290 were

allocated to Preferred Accounts and collectively made approximately $648,000 on the first day

of trading. The remaining 206 trades collectively *lost* approximately $767,000 on the first day of

trading; those losing trades were allocated to Non-Preferred Accounts.

40.     Moreover, random chance cannot account for huge disparity between how well

the Preferred Accounts preformed (more than $4.6 million of first day gains) as compared to how

well the Non-Preferred Accounts performed (more than $5.5 million of first day losses).  The

odds that random chance could account for this difference in first-day profits and losses between

the Preferred and Non-Preferred Accounts is less than one in a billion.

### 3. **Profits from the Cherry-Picking Scheme**

41.     Defendants' cherry-picking scheme and the fraudulent allocation of trading profits resulted in massive ill-gotten gains to the Preferred Accounts. The Defendants' cherry-picking scheme resulted in ill-gotten gains of at least $4.6 million (not including losses avoided), all of which was deposited into the Preferred Accounts. During the Relevant Period, at least $2.24 million of the illegal profits have already been withdrawn from the Preferred Accounts purportedly by the Relief Defendants.

42.     Moreover, the Preferred Accounts' average first day profits on stock trades were 0.57%, which is approximately 17 times higher than the typical one day return on an investment in the stock market. An investment earning 0.57% per day would double in value every six months. By comparison, it would take over seven years for an investment position earning 10% per year to double in size.

### 4. **Defendants Acted with Scienter and Negligently.**

43.     Throughout the Relevant Period, Sugranes was an employee, part owner, one of two IARs at, and director of UCB Advisers, and an Executive Director of the Holding Company that has a Financial Division of which UCB Services and UCB Advisers are part. UCB Advisers and UCB Services are the two investment advisory firms that placed the trades and improperly allocated millions of dollars of profitable trades to the Preferred Accounts while allocating unprofitable trades to the Non-Preferred Accounts.

44.     Sugranes knew or was severely reckless in not knowing, or should have known, that he was engaging in numerous deceptive acts throughout the Relevant Period by directly or

indirectly allocating the profitable trades to the Preferred Accounts held by the Relief Defendants, and allocating the non-profitable trades to the Non-Preferred Accounts.

45.     Throughout the Relevant Period, Sugranes acted negligently since his actions fell below the applicable standard of care as no reasonable person or investment adviser would have repeatedly allocated profitable trades to the Preferred Accounts, while unprofitable trades were repeatedly being improperly allocated to Non-Preferred Accounts.

46.     Throughout the Relevant Period, Sugranes was an employee, part owner, IAR, and director of UCB Advisers, and, on information and belief, controlled the trading conduct for UCB Advisers' clients through the UCB Average Price Account and was acting for the benefit of UCB Advisers and within the scope of his employment. Accordingly, his mental state and negligence can be imputed to UCB Advisers.

47.     Throughout the Relevant Period, Sugranes was an Executive Director of the Holding Company, which is affiliated with UCB Services, and, based on information and belief, was acting as the agent of UCB Services, within the scope of his agency, and UCB Services controlled Sugranes' actions; therefore, his state of mind and negligence is imputed to UCB Services.

## II.     Defendants Repeatedly Violated Their Fiduciary Duties.

### A.     Defendants Are Investment Advisers.

48.     Each of the Defendants is an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Each of them held themselves out as providing investment advisory services and did receive or expected to receive compensation from acting as an investment adviser.

49.     The UCB Entities are both affiliated with The Holding Company.  The Holding

Company's website states that it is: "a conglomerate of Companies in the Financial, Real Estate

and Medical fields that puts at your disposal a powerful platform of products and services. *With*

*a highly qualified professional team, its objective is to offer the client personalized advice, in a*

*climate of security, trust and absolute discretion*." [Emphasis added].

50.     Moreover, the UCB Entities are both part of the "Financial Division" of the

Holding Company, which "seeks to assist the client in the formation and implementation of a

long-term investment strategy."

51.      UCB Advisers is a Florida-registered investment adviser that provides portfolio

management for individuals and/or businesses, and is compensated for providing investment

services by a percentage of assets under management ("AUM") and by fixed fees.

52.     Monthly account statements to both Preferred and Non-Preferred Accounts

identified UCB Advisers as "Your Financial Adviser."

53.     UCB Advisers charges the Preferred Account a fee of 2.50% of AUM and UCB

Advisers' Form ADV discloses that it charges a fee based on the amount of AUM to the Non-

Preferred Accounts.

54.     Sugranes is an investment adviser.  He provides investment advice to UCB

Advisers' clients, including advising them as to the purchase and sale of stocks and options that

were subject to the cherry-picking scheme and on information and belief, he is compensated for

providing those advisory services and received compensation, either directly or indirectly,

through the cherry-picking scheme.

55.     UCB Services is an investment adviser.  According to the Holding Company's

website, UCB Services "seeks to assist the client in the formation and implementation of a long-

term investment strategy" and "[c]onsidering the expectations and needs of each investor, [UCB Services is] able to detect in the market those opportunities in investment products that allow the achievement of their financial objectives."  UCB Services uses the same trading account as UCB Advisers to trade and allocate trades for its clients and its clients account statements from the Clearing Firm state that UCB Services is "Your Financial Adviser."

56.     Upon information and belief, UCB Services has been compensated or expected to be compensated, directly or indirectly, for providing investment advice to its clients.

57.     The UCB Entities had trading authority over the Preferred Accounts and at least some of the Non-Preferred Accounts.  For example, in September 2018, the Relief Defendants executed a Limited Trading Authorization form that authorized UCB Services "to buy, sell existing positions, tender, exchange, convert, or trade in stocks, bonds or other securities, to engage in margin purchases, to engage in short sales, and to engage in option transactions."

### 2.     Defendants Owed Fiduciary Duties to Their Advisory Clients.

58.     As investment advisers, Defendants are fiduciaries for their advisory clients and owed fiduciary duties to their advisory clients.  As such, each of the Defendants owe their advisory clients an affirmative duty of utmost good faith, are obligated to provide full and fair disclosure of all material facts, have an affirmative obligation to employ reasonable care to avoid misleading their clients, have a duty to act in their clients' best interests, and have a duty to seek best execution of a client's transactions.  Defendants' duty to disclose all material facts includes a duty to tell clients about all of their actual or potential conflicts of interest that might incline any of them to render investment advice that is not disinterested.

### 3.     Defendants Cherry-Picking Scheme Breached The Fiduciary Duties They Owe to Their Advisory Clients.

59.     As investment advisers, Defendants owed a fiduciary duty to their clients.

60.     That fiduciary duty entails an affirmative duty of utmost good faith, obliges Defendants to act in the best interest of their clients, and imposes a duty to disclose all material facts to each of their clients regarding how trade allocations were actually occurring.

61.     As further described above, Defendants have been and are carrying out a cherry-picking scheme.  By carrying out this scheme, the Defendants repeatedly breached their fiduciary duties and failed to act in their clients' best interests.  Moreover, Defendants breached their fiduciary duty by failing to disclose to their clients all material facts of the trading – including that profitable trades were disproportionately directed to the Preferred Account and away from their accounts.

### 4.  **Defendants Did Not Disclose Material Facts.**

62.     On information and belief, Defendants did not disclose to their clients that profitable trades would be and were repeatedly being allocated to the Preferred Accounts and unprofitable trades would be and were repeatedly being allocated to Non-Preferred Accounts.

63.     It would have been important to a reasonable investor that was relying on Defendants to place their trades to know that trades were being allocated based on their performance after purchase, were not being allocated fairly and equitably or on a true "average price" basis, and that the Preferred Accounts were often receiving profitable trades and the Non-Preferred Accounts were often receiving non-profitable trades.

## II.     **Relief Defendants Received Proceeds from Defendants' Fraud to Which They Have No Legitimate Claim.**

64.     As alleged above, each of the Relief Defendants received proceeds from Defendants' fraud for which they provided no reciprocal goods or services, and to which they have no legitimate claim. As a result, those funds should be disgorged.

65.     Sugranes and the Relief Defendants collaborated, acted in concert, and had a close relationship. The Relief Defendants appear to be Surganes' parents or close relatives. Sugranes was born in Leon, Nicaragua, and the Relief Defendants have Nicaraguan passports and live in Leon, Nicaragua. Each of them share the same surname "Sugranes," and Sugranes and Relief Defendant Ramiro Sugranes Hernandez, share the same first name ("Ramiro"). The Relief Defendants are also old enough to be Sugranes parents as they are approximately twenty-five years older than Sugranes.

66.     Furthermore, the Relief Defendants monthly account statements were sent to Sugranes' domicile or an entity that he partially owns and is just one of the two employees who work for the firm. In 2015 and early 2016, the Clearing Firm sent the monthly account statements for the First Preferred Account held at UCB Services to Sugranes' apartment (where Sugranes lived during that time-period). From approximately March 2016 through the present, the Clearing Firm sent the monthly account statements for the Preferred Accounts held at UCB Services and UCB Advisers to UCB Advisers (an entity that Sugranes partially owns and is just one of the two employees who work for the firm).

67.     Moreover, Sugranes and the Relief Defendants acted in concert by Sugranes placing the illicit profits from the cherry-picking scheme in the Preferred Accounts and the Relief Defendants purportedly removed more than $2.4 million from the Preferred Accounts.

## **CLAIMS FOR RELIEF**

### **First Claim for Relief**
**Section 17(a)(1) and (3) of the Securities Act**
(All Defendants)

68.     The SEC realleges and incorporates by reference the above paragraphs 1 through 57 and 62 through 67 as though fully set forth herein.

69.     Defendants, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

70.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)].

**Second Claim for Relief**
**Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act**
(All Defendants)

71.     The SEC realleges and incorporates by reference above paragraphs 1 through 57 and 62 through 67 as though fully set forth herein.

72.     Defendants, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly, with scienter, and severely recklessly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

73.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

### Third Claim for Relief
### Sections 206(1) and 206(2) of the Advisers Act
(All Defendants)

74.     The SEC realleges and incorporates by reference the above paragraphs 1 through 67 as though fully set forth herein.

75.     Defendants are investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

76.     Defendants, while acting as investment adviser, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, acting with the requisite state of mind:  (a) employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and (b) engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

77.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined, will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### Fourth Claim for Relief
### Equitable Disgorgement
(All Defendants and Relief Defendants)

78.     The SEC realleges and incorporates by reference the above paragraphs 1 through 67 as though fully set forth herein.

79.     Upon information and belief, each Defendant received ill-gotten gains as a result of their fraudulent conduct.

80.      The Relief Defendants received and held proceeds of the fraud committed by the Defendants. Sugranes and the Relief Defendants collaborated and had a close relationship.

Sugranes, therefore, should be held liable jointly and severally liable with the Relief Defendants for the illicit proceeds that the Relief Defendants received.

81.     The Relief Defendants do not have a legitimate claim to these illicit proceeds, having obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore each of them has been unjustly enriched.

## RELIEF REQUESTED

**WHEREFORE**, the SEC respectfully requests that this Court:

### I.

Find that the Defendants committed the violations alleged in this Complaint;

### II.

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, temporarily, preliminary and, permanently restraining and enjoining Defendants and their agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with him or it, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)];

### III.

Order each of the Defendants and the Relief Defendants to disgorge all ill-gotten gains received and pay prejudgment interest on such ill-gotten gains, and hold Sugranes jointly and

severally liable for the amount of disgorgement and pre-judgment interest ordered against the Relief Defendants;

**IV.**

Order each of the Defendants to pay third-tier civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

**V.**

Order Defendants and Relief Defendants on an expedited basis to provide to the SEC and the Court a sworn accounting and allow the parties to take expedited discovery;

**VI.**

Order Defendants and Relief Defendants until further Order of the Court to preserve records and documents related to this case;

**VII.**

Order that Sugranes and Relief Defendants assets are frozen until further Order of the Court to preserve them to pay their equitable liabilities and for them to repatriate any funds held abroad;

**VIII.**

Order a conduct-based injunction that Sugranes, on a temporary, preliminary, and permanent basis, is prohibited from directly or indirectly, including but not limited to through any entity he owns or controls, placing trades in or transferring money from any brokerage accounts without written authorization from the account owner(s); and

**IX.**

Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted,

June 10, 2021                          By: _Christopher E. Martin_

Christopher E. Martin, Esq.
Arizona Bar No. 018486
Senior Trial Counsel
(303) 844-1106
martinc@sec.gov

Mark L. Williams, Esq.
New York Bar No. 4796611
Senior Trial Counsel
(303) 844-1027
williamsml@sec.gov

Attorneys for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294